FILED
2013 Dec-10  AM 10:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **ALTON RAY FROST, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.: 2:11-cv-2307-RDP** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of the Social** | ) | |
| **Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Plaintiff Alton Ray Frost, Jr. ("Plaintiff"), brings this action pursuant to Title II of Section 205(g) and Title XVI of Section 1631(c)(3) of the Social Security Act (the "Act"), seeking review of the decision by the Commissioner of the Social Security Administration[1] ("Commissioner") denying his claims for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI"). *See also* 42 U.S.C. §§ 405(g), 1383(c). After careful review, the court finds that the decision of the Commissioner is due to be affirmed.

### I.    Proceedings Below

Plaintiff applied for DIB and SSI on April 5, 2007 alleging disability beginning August 15, 2006 due to blackouts, seizures, headaches, and memory loss, high blood pressure, and problems with his left shoulder, nerves, and heart. [R. 120-129]. The Social Security Administration denied Plaintiff's claims on August 24, 2007. [R. 57-58]. Plaintiff requested [R. 74-75] and received a

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Therefore, she should be substituted for Commissioner Michael J. Astrue as Defendant in this suit. *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. Later proceedings should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must be disregarded.").

hearing before an administrative law judge ("ALJ").  The ALJ held a hearing on August 24, 2009. [R. 31-56].  The ALJ issued a decision on September 9, 2009 denying disability benefits. [R. 13-29]. On April 28, 2011, the Appeals Council denied Plaintiff's request for review [R. 1-6], making the making the Commissioner's decision final.  Therefore, judicial review in this case is proper.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

Plaintiff was 38 years old at the time of the hearing and had a tenth grade education. [R. 37]. He had completed a commercial truck driving course and had most recently worked as a driver for three months in 2007. [R. 37].  He was fired after having an accident. [R.37].  Plaintiff received unemployment benefits throughout part of 2008. [R. 45]. He sought work as a forklift driver because had performed that job successfully for nine years. [R. 46]. Plaintiff was living with his aunt and cousin.  He had lived with his mother until she died in early 2009. [R. 44].  Plaintiff testified that he cared for his mother's physical needs, checked her insulin, and cooked dinner. [R. 44-45].   Since his mother had died, Plaintiff had complained about depression to his doctors. [R. 50].

In response to a question from the ALJ, Plaintiff testified that his pain prevented him from working. [R. 48].  According to Plaintiff, he experienced pain in his knees, shoulder, back, head, and chest. [R. 48].  Plaintiff stated that his pain was worse when he engaged in any type of physical activity. [R. 48].  Plaintiff also testified that he "stay[ed] dizzy all the time." [R. 49].

A vocational expert ("VE") testified that Plaintiff's past relevant work was as a forklift operator, which he classified as medium, semi-skilled. [R. 51].   The ALJ posed two hypothetical questions to the VE.  In the first, the ALJ asked the VE whether someone of Plaintiff's age, education, and work experience  who could perform the full range of light work as defined in the regulations but was limited to occasional crawling and must work in a temperature and humidity

controlled environment with no exposure to industrial hazards and who could perform only simple tasks with limited public contact, would be able to perform work existing in the national economy. [R. 52].  The VE testified that this individual could perform work as a packager of small parts, a storage facility clerk, or a marker of semiconductor wafers. [R. 52-53].  The second hypothetical involved the same individual only this person would have occasional, unplanned disruptions (up to one third of the time) during the work day and work week. [R. 53].  In response to this hypothetical, the VE testified that this individual would be unable to perform Plaintiff's past relevant work or any other work in the national economy. [R. 54].

Plaintiff submitted various medical records in support of his claims including documentation of several hospitalizations for treatment of various heart problems. [R. 307-309; 380-382; 439-442; 511-512; 553-554; 570-572; 594; 640; 680; 713-717).  In April 2007, Plaintiff was admitted to Carraway Methodist Medical Center.  He underwent a cardiac catheterization along with a ballooning procedure for placement of a stent. [R. 307-309].  An echocardiogram also showed left bundle branch pattern and a left ventricular ejection fraction of 30-35% with moderate global hypokinesis. [R. 308].

Plaintiff and his mother submitted reports to the Social Security Administration in April 2007 regarding his alleged seizures. [R. 151-152; 161-162].  Plaintiff reported having experienced seizures for at least one year but he was not currently taking any seizure medication and had not sought professional medical treatment for his seizures. [R. 152].  Plaintiff had not had any evaluation or treatment for his seizures since 1993. [R. 162].

In May 2007, Plaintiff followed-up with his physician and reported having headaches almost every morning. [R. 341].  He also complained of high blood pressure and seizures. [R. 341].

3

Treatment notes indicate that Plaintiff was unable to afford his blood pressure medication and that he was not currently on any medication for his seizures. [R. 341]. In July 2007, Plaintiff returned for a follow-up visit and reported that most of the time his pain during his headaches was "bearable." [R. 339]. He was prescribed Lortab to help with this pain. [R. 339]. Plaintiff stated that he was driving, although he had been instructed not to drive for six weeks due to his reported seizures. [R. 339].

In November 2007, Plaintiff filed a report with the Social Security Administration stating that since filing his last report in March 2007, he had not seen a doctor or visited a hospital for the physical or mental illnesses, injuries, or conditions that he alleged prevented him from working. [R. 211]. Plaintiff also reported that his illnesses, injuries, or conditions did not affect his ability to care for his personal needs. [R. 213].

In late January 2008, Plaintiff was hospitalized for two nights after experiencing chest pain. [R. 380-382]. Plaintiff was diagnosed with uncontrolled hypertension and non-cardiac chest pain. [R. 380-382; 680]. Plaintiff tested positive for benzodiazepine and opiates. [R. 383]. A cardiac catheterization revealed the stent was open. [R. 680]. Plaintiff reported he had not taken his prescribed medication in two to three months. [R. 380-382]. Upon discharge, Plaintiff was "counseled at length regarding the importance of continuing his medications." [R. 680]. He was instructed to avoid strenuous activity or lifting more than five to ten pounds of two weeks. [R. 681].

Plaintiff was hospitalized again for three days in March 2008. [R. 407-438]. Upon admission and discharge, Plaintiff was diagnosed with acute coronary syndrome, hypertensive urgency, headache, and Bell's palsy. [R. 409]. Plaintiff reported that he had not taken any of his medication in two to three days. [R. 409]. Upon discharge, Plaintiff was instructed to maintain a cardiac

4

conscious diet and to maintain compliance with his home medications. [R. 410].   While hospitalized, Plaintiff requested a letter from his doctor supporting his disability claim. [R. 419].   On March 25, 2008, Plaintiff's physician, Dr. Ellen Webber, M.D., provided a letter stating that Plaintiff was a patient of hers at Carraway Community Care Clinic and was being treated for MI (myocardial infarction) seizures, hypertension, and congestive heart failure. [R. 537].   Dr. Webber stated that based upon these conditions, Plaintiff was "unable to work at this time." [R. 537].

In June 2009, Plaintiff was admitted to the hospital for two days. [R. 511].   He was experiencing chest pain and shortness of breath.   Plaintiff's admission diagnosis was acute coronary syndrome but he was ultimately discharged with a diagnosis of pneumonia. [R. 511].   In September 2008, Plaintiff was admitted to the hospital for acute congestive heart failure exacerbation with hypertensive emergency, history of myocardial infarction, and stenting. [R. 439-442].   Plaintiff tested positive for benzodiazepine and opiate use. [R. 453].   Plaintiff was instructed to fill generic prescriptions and to follow-up at the internal medicine clinic.  [R. 442].   He received a sample of Plavix upon discharge due to his financial disability. [R. 442].

In late November 2008, Plaintiff was hospitalized and diagnosed with seizure disorder, coronary artery disease, Dyslipemio, tobacco abuse, alcohol use, hypertension, and arrhythmia. [R. 570].   Plaintiff reported smoking three to four packs of cigarettes per day. [R. 584].   Upon discharge, Plaintiff was instructed to follow-up with the family practice clinic. [R. 572].   However, the record contains no evidence that he did so.   Plaintiff was again admitted to the hospital in May 2009. [R. 640-641].   Plaintiff was diagnosed with non-ST elevation  myocardial infarction and ischemic cardiomyopathy. [R. 640].   Secondary diagnoses included coronary artery disease, hyperlipidemia, anxiety, and persistent tobacco use.  [R. 640].   Plaintiff's stent was cleaned out and second one

inserted.  Upon discharge, Plaintiff was counseled on smoking cessation and was instructed to follow a low-fat, low-salt diet. [R. 640].

In June 2009, Plaintiff was again hospitalized for an evaluation of his chest pain and shortness of breath. [R. 553].  According to treatment notes, Plaintiff could not provide details about his chest pain and shortness of breath and got "a little frustrated" when asked. [R. 553].  Plaintiff reported he was not currently taking any mediation because he "lost his prescriptions." [R. 553].  The physician listed impressions of chest pain/coronary artery disease, ischemic cardiomyopathy, hyperlipidemia, continued tobacco use, medical noncompliance, and memory deficits post head injury. [R. 554].

When Plaintiff followed-up with a cardiologist on June 23, 2009, he reported that he had not been taking Plavix and stated that the doctor did not previously give him a prescription. [R. 594]. Treatment notes indicate that "compliance is a problem." [R. 594].  Treatment notes also state that Plaintiff's "economic situation is very bad.  He is essentially homeless." [R. 594].  Plaintiff's physician provided him with enough samples of Crestor, Benicar, and Coreg for at least two months. [R. 594].

On July 26, 2009, Plaintiff was admitted to the hospital again for treatment of his chest pain. [R. 713-714].  He was diagnosed with unstable angina and history of coronary artery diseases with multiple percutaneous interventions. [R. 713].

Plaintiff also submitted various state agency consultative exam notes.[2]  On August 8, 2007, Sally A. Gordon, Psy.D., performed a consultative psychological examination. [R. 343].  Dr. Gordon reviewed Plaintiff's medical history, which included migraine headaches, myocardial infarction,

---

[2]  The record evidence indicates that Plaintiff's situation has changed drastically since August 2007.

enlarged heart, seizures, hypertension, decreased hearing in his left ear, coma, and head injury resulting in a plate in his head. [R. 344]. Plaintiff reported a 24-year history of smoking three-quarters of a pack of cigarettes per day. He also stated that he began using alcohol when he was 15 and consumed a case of beer a day until 1991 or 1992. But, since that time, Plaintiff started that he consumes no more than three beers on an occasional basis. [R. 344].

During the examination, Plaintiff was pleasant, polite, and socially appropriate. He was able to spontaneously initiate interactions and maintained good eye contact and rapport. Plaintiff reported decreased hearing in his right ear, but Dr. Gordon noted that Plaintiff did not appear to have difficulty hearing during the evaluation and did not exhibit any visual impairments. [R. 344]. Dr. Gordon commented that Plaintiff's receptive and expressive language skills appeared to fall within average limits and he had no difficulty comprehending questions and test instructions. [R. 344]. Plaintiff's immediate and general memory tested in the average range. His immediate memory scores for immediate and delayed auditory information tested in the average and low average ranges, respectively. Plaintiff's abstract thinking was within normal limits and his thought processes were coherent, with no evidence of tangential or circumstantial thinking. [R. 345]. Dr. Gordon noted that Plaintiff's daily activities included: attending to his personal hygiene and dressing; housecleaning chores; laundry; shopping; and, shared cooking responsibilities with his mother. [R. 345]. Plaintiff was able to manage his medications and drive.

Dr. Gordon diagnosed Plaintiff with major depressive disorder, single episode moderate and insomnia related to depression and anxiety. Dr. Gordon noted that Plaintiff's Global Functioning Assessment ("GAF") score was 50. [R. 346]. Based upon her evaluation, Dr. Gordon opined that Plaintiff would be capable of learning and remembering work instructions at an average level. She

commented that he would benefit from participation in a vocational rehabilitation program to identify and receive training in an alternative area from his past work.  According to Dr. Gordon, once Plaintiff found work in an appropriate vocational field and was able to earn a living, most of his psychological difficulties should subside. [R. 346].  Dr. Gordon suggested a gradual return to full-time employment as stress and fatigue will likely exacerbate Plaintiff's seizures. But, she opined that Plaintiff should have no trouble getting along amicably with coworkers and responding appropriately to supervision. [R. 346].

On August 10, 2007, Charles Carnel, M.D., performed a consultative physical examination. [R. 347].  Dr. Carnel noted that Plaintiff was mildly obese with extremely poor hygiene and that he demonstrated no signs of pain during any portion of the examination. [R. 349-350].  Current medications included Coreg, Plavix, Spironolactone, Crestor, Furosemide, Benicar Hydrochlorothiazide, Protonix, Phenytoin, and Xanax. [R. 348]. Dr. Carnel diagnosed Plaintiff with coronary artery disease, status post cardiac catheterization and stenting, congestive heart failure, and traumatic brain injury. [R. 351].

On August 23, 2007, Robert Estock, M.D., completed a Psychiatric Review Technique. [R. 352].  He opined that Plaintiff's depressive disorder caused mild limitations in Plaintiff's activities of daily living, and moderate difficulties in maintaining social functioning, concentration, persistence, and pace. [R. 362].  Plaintiff had not experienced an episode of decompensation. [R. 362].  Dr. Estock also completed a Mental RFC Assessment. [R. 374].   Dr. Estock opined that Plaintiff was either not significantly limited or only moderately limited in his understanding and memory, sustained concentration and persistence, and adaption.  Dr. Estock found that Plaintiff was not significantly limited in social interaction. [R. 374-375].

Also, on August 23, 2007, Dawn Powers completed a Physical RFC Assessment. [R. 366-373]. Powers opined that Plaintiff has the following exertional limitations: he can occasionally lift and/or carry 20 pounds; he can frequently lift and/or carry 10 pounds; he can stand and/or walk for a total of six hours in an 8-hour work day; he can sit for a total of six hours in an 8-hour work day; and he can push and/or pull with no restrictions, other than those shown for lift and/or carry. [R. 367]. Regarding postural limitations, Powers opined that Plaintiff can frequently: climb ramps and stairs; balance; stoop; kneel; and, crouch. Powers further opined that Plaintiff can occasionally crawl and should never climb ladders, ropes, or scaffolds. [R. 368]. Powers found no manipulative, visual, or communicative limitations. [R. 370]. Regarding environmental limitations, Powers opined that Plaintiff should avoid concentrated exposure to extreme cold and heat, wetness, humidity, and hazardous machinery and heights. [R. 370].

## II.    ALJ Decision

Disability under the Act is determined under a five-step test. 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). "Substantial work activity" is work activity that involves doing significant physical or mental activities. 20 C.F.R. § 404.1572(a). "Gainful work activity" is work that is done for pay or profit. 20 C.F.R. § 404.1572(b). If the ALJ finds that the claimant engages in substantial gainful activity, then the claimant cannot claim disability. 20 C.F.R. § 404.1520(b). Second, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. § 404.1520(a)(4)(ii). Absent such impairment, the claimant may not claim disability. (*Id.*). Third, the ALJ must determine whether the claimant's impairment meets or

medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  *See* 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526.  If such criteria are met, the claimant is declared disabled.  20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ may still find disability under the next two steps of the analysis.  The ALJ must first determine the claimant's residual functional capacity ("RFC"), which refers to the claimant's ability to work despite her impairments.  20 C.F.R. § 404.1520(e).  In the fourth step, the ALJ determines whether the claimant has the RFC to perform past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant is determined to be capable of performing past relevant work, then the claimant is deemed not disabled.  (*Id.*).  If the ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the fifth and final step.  20 C.F.R. § 404.1520(a)(4)(v).  In the last part of the analysis, the ALJ must determine whether the claimant is able to perform any other work commensurate with his RFC, age, education, and work experience.  20 C.F.R. § 404.1520(g).  Here, the burden of proof shifts from the claimant to the ALJ to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given her RFC, age, education, and work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c).

In the instant case, the ALJ found that Plaintiff has not engaged in substantial gainful activity since August 15, 2006, the alleged onset date.[3] [R. 18].  The ALJ concluded that Plaintiff has the following severe impairments: hypertension; status post cardiac stenting; status post a myocardial infarction; possible seizures; possible headaches; history of a single episode of depression; anxiety;

---

[3]  The ALJ did note that Plaintiff briefly  worked as a truck driver in 2007 and testified that he received unemployment benefits in 2008. [R. 18].  According to the ALJ, although no objective evidence suggested that this work rose to the level of substantial gainful activity, the ALJ concluded that it suggested Plaintiff may not be as disabled as he alleged. [R. 18].

and, history of substance abuse. [R. 18].  Nonetheless, the ALJ determined that Plaintiff does not

have an impairment or combination of impairments that meets or medically equals one of the listed

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically Listing 4.00 (Cardiovascular

System) and Listing 12.00 (Mental Disorders).  [R. 19].  After consideration of the entire record, the

ALJ found that Plaintiff has the RFC to perform light work, as defined in 20 C.F.R. §§ 404.1567(b)

and 416. 967(b) but with the following limitations: Plaintiff should do no more than occasional

crawling; he must work in a temperature and a humidity controlled environment; he must have no

exposure to industrial hazards; he can perform only simple tasks; and, he should have no more than

limited public contact. [R. 20].  The ALJ concluded that Plaintiff is unable of performing his past

work as a forklift operator or truck driver. [R. 27].  However, the ALJ determined that jobs existed

in the national economy that someone of Plaintiff's age, education, experience, and RFC could

perform, including: packager of small parts, storage security clerk, and marker of semi-conductor

wafers. [R. 28].  Accordingly, the ALJ found that Plaintiff is not disabled, as that term is defined in

the Act. [R. 28].

## III.   Plaintiff's Argument for Reversal

Plaintiff seeks to have the Commissioner's decision reversed, or in the alternative, remanded

for further proceedings. [Pl.'s Mem. 12].  Plaintiff contends that the ALJ's decision is not supported

by substantial evidence and that improper legal standards were applied because the ALJ failed to

properly evaluate the medical evidence of record. [Pl.'s Mem. 9-12].

## IV.   Standard of Review

The only issues before this court are whether the record reveals substantial evidence to

sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th

Cir. 1982), and whether the correct legal standards were applied.  *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).   Title 42 U.S.C. §§ 405(g) and 1383(c)(3) mandate that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).   The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence.  *See id.*  (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted).   If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings.  *See Martin*, 894 F.2d at 1529.  While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

## V.   Discussion

After careful review, the court concludes that substantial evidence supports that ALJ's decision and that proper legal standards were applied.  Plaintiff argues that the ALJ failed to properly consider the medical evidence of record.   Plaintiff provides two separate grounds upon which he bases this argument.  First, Plaintiff maintains that the ALJ in evaluating Plaintiff's credibility, failed to consider that Plaintiff's physicians had prescribed Xanax and Lortab. [Pl.'s Mem. 9-10].  Second,

Plaintiff contends that the ALJ failed to properly consider "significant evidence from treating and examining sources, including opinions that Plaintiff is disabled from performing work-related activities." For the reasons stated below, the court rejects each allegation in turn.

If an ALJ rejects a claimant's allegations of pain, "he must articulate explicit and adequate reasons" for doing so. *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995); *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (noting that it is within the ALJ's discretion to determine, after listening to the claimant's testimony, that her claims of pain were not credible).

In considering Plaintiff's allegations of pain, the ALJ concluded that although his medically determinable impairments could reasonably be expected to cause some of his alleged symptoms, his statements concerning the intensity, persistence, and limiting effects of the symptoms were not fully credible. [R. 26-27]. The ALJ considered a number of factors in reaching this conclusion including: Plaintiff's noncompliance with taking his medications; Plaintiff's work history; Plaintiff's daily activities; relevant medical records; Plaintiff's receipt of unemployment benefits; Plaintiff's continued smoking despite doctor's orders to quit; and, the type, extent, frequency, and effectiveness of medications. [R. 21-27]. The Eleventh Circuit has found that an ALJ's rejection of a claimant's testimony is based upon substantial evidence where factors such as these are considered. *See Dyer v. Barnhart*, 395 F.3d 1206, 1212 (11th Cir. 2005) (finding that the ALJ properly discredited claimant's subjective complaints when "the ALJ considered [claimant's] activities of daily living, the frequency of his symptoms, and the types and dosages of his medications, and concluded that [claimant's] subjective complaints were inconsistent with his testimony and the medical record"). In fact, Plaintiff does not dispute that the ALJ properly rejected his credibility for any reason other than what Plaintiff characterizes as a failure to consider that Plaintiff's physicians had prescribed

13

Xanax and Lortab, which would account for his positive testing for opiates and benzodiazepines. [Pl.'s Mem. 9-10].

In making his credibility findings, the ALJ noted that the records indicated that Plaintiff "had serious problems with substance abuse in the past. [R. 21]. The ALJ further noted that Plaintiff acknowledged he used to be alcoholic. [R. 21]. The ALJ also considered Plaintiff's doctor's indication that Plaintiff was dependent on Xanax and was engaged in drug seeking behavior in 2006. [R. 21-22; 24; 279; 288-289; 440; 514]. The ALJ cited various medical records indicating that Xanax was a controlled drug prescribed to Plaintiff . [R. 22-25]. The ALJ contrasted this evidence of Plaintiff's prior problems with his current statements that he had been sober "for a long time" and had minimized cigarette use in 2008. [R. 21-22; 25; 440]. However, Plaintiff reported occasional use of alcohol and smoking a pack of cigarettes a day in 2009. [R. 25; 642]. The court fails to see how the ALJ's analysis on this specific point was improper, particularly when analyzed against the record as a whole the specific reasons cited by the ALJ for discrediting Plaintiff's testimony.

The ALJ properly considered a number of factors in making his credibility determination. The ALJ correctly noted that while seeking disability benefits, he was receiving unemployment compensation while looking for a job. [R. 26]. *See, e.g., Carmickle v. Comm'r of Soc. Sec.,* 533 F.3d 1155, 1161-62 (9th Cir. 2008) (acknowledging that "receipt of unemployment benefits can undermine a claimant's alleged inability to work fulltime"); *Schmidt v. Barnhart,* 395 F.3d 737, 745 (7th Cir. 2005) ("[W]e are not convinced that a Social Security claimant's decision to apply for unemployment benefits and represent to state authorities and prospective employers that he is able and willing to work should play absolutely *no* role in assessing his subjective complaints of disability.") (emphasis in original); *Barrett v. Shalala,* 38 F.2d 1019, 1024 (8th Cir. 1994) ("In

14

addition, in order to be eligible for unemployment benefits, Barrett was required to sign documents stating that he was capable of working and seeking work. This statement is clearly inconsistent with Barrett's claim of disability during the same period.").[4]   The ALJ further discussed Plaintiff's activities of daily living, noting that Plaintiff took care of his personal needs, cooked, shopped, and did other household chores, such as laundry. [R. 22, 171-172; 1987-188; 192].  Plaintiff also stated that he mowed the lawn once a month and walked up to one mile a day for exercise. [R. 22, 23, 173, 189, 192].  Plaintiff took care of his disabled mother until she died. [R. 19].  He also completed a truck driving school, received a commercial driver's license, and worked as a truck driver trainee in 2007, until he had an accident.  [R. 26; 130-131, 136, 138, 343].  The ALJ properly considered these activities as part of his credibility assessment.  *See Moore v. Barnhart*, 405 F.3d 1208, 1212 (affirming an ALJ's credibility determination, which relied upon inconsistencies between the claimant's "descriptions of her diverse daily activities and her claims of infirmity").  Additionally, the ALJ correctly considered that Plaintiff worked in January and February 2007, after his alleged onset date.  *See Ellison v. Barnhart*, 355 F.3d 1272, 1275-76; *see also Melton v. Apfel*, 181 F.3d 939, 941 (8th Cir. 1999) (noting the claimant's part-time work after his alleged onset date as evidence undermining his subjective complaints).  In sum, the court concludes that the ALJ properly consider the record as a whole and provided specific and adequate reasons for rejecting Plaintiff's subjective complaints.  Therefore, the Commissioner's decision is due to be affirmed on this ground.  *See*

---

[4] *See also Peden v. Astrue,* 2012 WL 5379172, *5 (N.D. Ala. Oct. 31, 2012) (finding the ALJ's determination that claimant's unemployment application detracted from her credibility supported by substantial evidence); *Butler v. Comm'r of Soc. Sec.,* 2012 WL 628489, *7 (M.D. Fla.  Feb. 27, 2012) ("Plaintiff's allegations of total disability are inconsistent with his receipt of unemployment benefits where he held himself out as being able to work."). *Bullock v. Astrue,* 2012 WL 2357718, *7 (N.D. Ala.  June 20, 2012) ("[T]he receipt of unemployment benefits requires a claimant to demonstrate they are able to work—a position inherently contradictory to the requirements of disability benefits.").

*Foote,* 67 F.3d at 1662 (an ALJ's clearly articulated credibility finding will not be disturbed when supported by substantial evidence).

Plaintiff also contends that the ALJ improperly rejected the opinions of treating and examining physicians, including a statement that Plaintiff was disabled from performing work-related activities. [Pl.'s Mem. 11].   The court disagrees and finds that the ALJ properly rejected a treating physician's opinion that Plaintiff was disabled.

An ALJ may disregard a treating physician's opinion if it is unsupported by objective medical evidence or is merely conclusory. *Johns v. Bowen*, 821 F. 2d 551, 555 (11 th Cir. 1987).   Moreover, the ALJ may reject the opinion of a treating physician if it is "so brief and conclusory that it lacks persuasive weight or when it is unsubstantiated by any clinical or laboratory findings." *Hudson v. Heckler*, 755 F.3d 781, 784 (11th Cir. 1985).   Contrary to Plaintiff's assertion, the ALJ properly rejected Dr. Weber's conclusory opinion that Plaintiff could not work. [R. 23, 537].   Dr. Weber's opinion consists of her listing Plaintiff's diagnoses and then summarily concluding that he could not work.   As the ALJ noted, Dr. Weber "made no effort to interrelate her conclusions with the underlying evidence." [R. 24].   The court agrees that Dr. Weber's opinion is of the brief and conclusory type that the Eleventh Circuit has found may properly be rejected by the ALJ.  *See Johns*, 821 F.2d at 555; *Hudson*, 755 F.2d at 784.   Further, Dr. Weber's opinion that Plaintiff was unable to work is a decision reserved for the Commissioner.   *See* 20 C.F.R. § 404.1527 ("We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.").

Accordingly, because the ALJ properly discredited Dr. Weber's opinion that Plaintiff could not work, the Commissioner's decision is not due to be reversed on this ground.

## VI.    Conclusion

For the reasons stated above, the court concludes that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence and that proper legal standards were applied. Therefore, the Commissioner's decision is due to be affirmed.  A separate order in accordance with this memorandum opinion will be entered.

**DONE** and **ORDERED** this ____10th____ day of December, 2013

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE